UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AMAYLA THURMOND,

                Plaintiff,

        v.

MARGARET BOWMAN and
WILFRED TOMBS,

                Defendants.

_____

<u>DECISION & ORDER</u> and
<u>REPORT & RECOMMENDATION</u>

14-CV-6465W

## **PRELIMINARY STATEMENT**

        Amayla Thurmond ("Thurmond") has commenced this action against Margaret

Bowman ("Bowman") and Wilfred Toombs[1] ("Toombs") (collectively, "defendants") asserting

violations of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601

*et seq*.  (Docket # 1).  Currently before the Court are defendants' motions for sanctions and a

preliminary injunction enjoining Thurmond from "accessing" her social media accounts during

the pendency of this action (Docket ## 37, 37-1 at ¶ 27, 40) and their motion to disqualify

Thurmond's counsel (Docket # 69).  For the reasons discussed below, defendants' motions for

sanctions and disqualification of counsel are denied.  I further recommend denial of defendants'

motion for a preliminary injunction.

---

[1] The caption of the complaint identifies Wilfred "Tombs" as a defendant, although it appears that the proper spelling is "Toombs."  (Docket ## 1, 5).

**FACTUAL BACKGROUND**

I.    **Defendants' Sanctions Motions**

Thurmond's claim in this case arises from her alleged attempt to rent an apartment in a building owned by Bowman and managed by Toombs.  (Docket # 1).  According to the complaint, Thurmond contacted Toombs on December 28, 2012 to inquire about an apartment that was advertised for rent.  (*Id.* at ¶¶ 13-15).  Thurmond alleges that although Toombs indicated that the apartment was available, Toombs refused to rent the apartment to her after learning that her two young children would be living with her.  (*Id.* at ¶¶ 16-19).  According to the complaint, Toomb's refusal to rent to her caused her to continue to be homeless and to be separated from her youngest daughter.  (*Id.* at ¶ 27).

Thurmond commenced this action on August 11, 2014.  (*Id.*).  Defendants contend that sometime in November or December 2014 their counsel located several of Thurmond's social media accounts, including Facebook, Instagram and Twitter accounts.  (Docket # 37-1 at ¶¶ 4-5).  According to defendants, they considered relevant several posts on those accounts and saved "screenshots" of a few of the Facebook posts.  (*Id.* at ¶ 6 and Exhibit ("Ex.") A; Docket # 82 at 29).

On December 18, 2014, counsel for defendants emailed counsel for Thurmond to convey a settlement offer ("the December 18, 2014 email").  (Docket # 37-1 at Ex. B).  Among other things, the email stated:

> [Settlement] will be beneficial to your client because all parties'
> lives become open to public inspection.  From what my PI tells me
> this may not be of an advantage to your client.  Cases such as these
> have the potential of reaching national attention.  That provides an
> even greater level of scrutiny.  When you address this fact let her
> know about the concept of spoilage so she does not try to delete
> her text messages and facebook account.

(*Id.*).

In a May 15, 2015 letter to the Court from counsel for Thurmond relating to another motion, Thurmond's counsel acknowledged that her client had Facebook and Instagram accounts and indicated that the accounts were private and could be viewed only by people authorized by Thurmond.  (Docket # 28).  In a May 19, 2015 affidavit filed with the Court, Thurmond affirmed that she had Facebook and Instagram accounts, both of which were private and could be viewed only by individuals authorized by Thurmond.  (Docket # 31 at ¶ 3).

On May 21, 2015, by order to show cause, defendants applied for an order imposing sanctions for spoliation of evidence and a preliminary injunction prohibiting Thurmond from accessing her social media accounts during the pendency of this action.  (Docket # 32).  Counsel's supporting declaration asserted that he viewed Thurmond's Facebook account at the same time as he received Thurmond's counsel's May 15 letter and observed posts "disappearing" from view on that account.  (Docket # 32-1 at ¶ 9).  According to defendants' counsel, among the deleted posts were two posts from December 28, 2012, the date of the alleged discrimination, and one from two days later.  (*Id.* at ¶ 8).  Counsel affirmed that "when [p]laintiff's Facebook page is observed, there is an obvious gap of posts between December 24, 2012 and May 11, 2014."  (*Id.* at ¶ 9 and Ex. C).

At oral argument on a different motion on May 21, 2015, the Court explained that it did not have authority to grant injunctive relief, but addressed with counsel the subject of a preservation order.  Thurmond's counsel indicated that Thurmond would be willing to stipulate to an order restricting her from deleting, altering, or moving any posts from her social media accounts while the order to show cause was pending.  The Court instructed the parties to confer regarding the precise language of the preservation order and prohibited Thurmond from deleting,

altering, or moving any social media posts pending entry of the written preservation order. Thurmond's counsel agreed to inform Thurmond forthwith of the Court's order.

On May 22, 2015, the Clerk of the Court notified defendants that their order to show cause application did not comply with the Local Rules for the Western District of New York and would need to be refiled. On June 9, 2015, Thurmond's counsel wrote to the Court to express her view that a preservation order "no longer makes sense" in view of the deficient order to show cause. (Docket # 46). The next day, defendants filed the pending motion for an order imposing sanctions for spoliation and granting preliminary injunctive relief.[2] (Docket # 37). The motion reiterates the allegations and contentions raised in the previously-filed order to show cause. (*Compare* Docket # 32 *with* Docket # 37).

In response to the June 9 letter from Thurmond's counsel, this Court entered a letter order providing:

> The Court understood that plaintiff's counsel at oral argument voluntarily agreed to the terms of a preservation order pending resolution of defendant's motion. That motion has been refiled. If plaintiff is no longer agreeable to negotiate a preservation order, counsel shall so advise this Court, and defendants shall submit a proposed order to this Court, which this Court shall review and approve, deny, or modify after reviewing comments by plaintiff's counsel. Pending a stipulated agreement or judicial decision on a proposed preservation order, plaintiff shall not alter her social media accounts.

(Docket # 46).

In their refiled motion, defendants maintain that spoliation sanctions are warranted for the missing Facebook posts. (Docket # 37-1 at ¶¶ 11- 27). According to defendants, Thurmond was on notice at least as of the date of the December 18, 2014 email that her Facebook postings might be relevant to the litigation. (*Id.* at ¶ 11). Defendants maintain that

---

[2] The portion of the motion seeking preliminary injunctive relief was referred to this Court for report and recommendation. (Docket # 39).

Thurmond's posts are relevant because they provide evidence of Thurmond's emotional state and living circumstances after the alleged discrimination.  (*Id.* at ¶¶ 12-13).  According to defendants, the missing posts would have demonstrated that she lived with her sister, despite her claim of "homeless[ness]," and was "happy and at a good place in her life," despite her claim of emotional distress.  (*Id.*).  Defendants contend that Thurmond intentionally deleted these relevant posts and thereby impaired defendants' ability to prove their defenses.  (*Id.* at ¶¶ 16-22, 27).  According to defendants, Thurmond's conduct justifies sanctions and, if an order of dismissal is not granted, an order enjoining Thurmond from accessing her social media accounts during the pendency of this action.  (Docket # 37-9).

On June 12, 2015, defendants filed a second motion for sanctions on the grounds that Thurmond violated this Court's verbal preservation order by deleting posts from her Facebook account.  (Docket # 40).  According to defendants' counsel, on May 21, 2015, he accessed Thurmond's Facebook account and printed the posts that were displayed.  (Docket # 40-1 at ¶ 6 and Ex. A).  Those posts consisted of Thurmond's profile pictures and cover photographs with associated comments between March 24, 2013 and July 28, 2014, and three posts dated March 20, 2013, December 20, 2013, and December 24, 2013.  (*Id.* at Ex. A).  Defendants' counsel indicated that he subsequently accessed Thurmond's Facebook account and discovered that every post except one (a cover photograph dated July 13, 2014) had been deleted.  (*Id.* at ¶ 11 and Ex. D).  Defendants maintain that the deleted posts are relevant and their deletion "has resulted in extreme prejudice . . . and has made it impossible to properly defend or pursue [their anticipated fraud] counterclaim."  (*Id.* at ¶¶ 17, 19).

On June 19, 2015, Thurmond's counsel informed the Court that although Thurmond's social media posts were not relevant to the litigation, she nevertheless was willing

to consent to an order preventing her from deleting any social media posts from the time period between December 2012 and March 2013.  (Docket # 48).  In response, the Court directed the parties to work together to agree on a proposed stipulation and order.  (*Id.*).  The parties could not agree and separately submitted proposed preservation orders to the Court.

Using the version submitted by Thurmond,[3] this Court entered a written temporary preservation order on July 16, 2015, prohibiting Thurmond from making any "changes, alterations, or deletions to her social media accounts, including but not limited to Facebook, Instagram and Twitter accounts, for postings covering the time period October 2012 through the present."  (Docket # 63).

On June 25, 2015, Thurmond filed her opposition to both sanctions motions.  (Docket # 51).  Thurmond maintains that her social media posts are not relevant to this litigation.  (*Id.*).  According to Thurmond, she has asserted a "claim for garden variety emotional distress" and does not claim to have sought medical treatment for the emotional damages claimed in the complaint.  (*Id.* at ¶¶ 4-5).  Additionally, Thurmond maintains that between December 28, 2012, the date of the alleged discrimination, and March 1, 2013, the date that she secured housing for herself and her children, she alternated between staying with her sister and staying with a friend.  (*Id.* at ¶ 6).  Thurmond maintains that she has never alleged that she was living on the street or in a homeless shelter.  (*Id.* at ¶ 6).  According to Thurmond, these facts demonstrate that her social media posts are not relevant.  (*Id.* at ¶ 7).

Thurmond also maintains that she has not deleted any Facebook posts.  (*Id.* at ¶ 8).  In a sworn affidavit submitted in opposition to the motions, Thurmond stated that she believed that when she created her Facebook account she had employed settings to permit only

---

[3]  The Court's order expanded the time period of posts subject to the order from March 2013, as proposed by Thurmond, to the present, as proposed by defendants.  (Docket # 63).

her Facebook "friends" to view her account. (Docket # 52 at ¶ 2). She also stated that she had

not deleted or removed any Facebook posts since May 15, 2015, when she was advised by her

attorney that the Court had directed her not to make any deletions. (*Id.* at ¶ 3). According to

Thurmond, between May 15, 2015 and June 17, 2015, she "hid" two or three posts from her

timeline that had been posted by other people and in which she had been "tagged." (*Id.* at ¶ 4).

Thurmond indicated that the posts had not been deleted and were not relevant to the subject

matter of this litigation. (*Id.*). Thurmond also stated that if the defendants were unable to view

her entire page, "it may be because I adjusted the privacy settings on my account to ensure that

only people I have 'friended' can see my posts." (*Id.* at ¶ 6).


## II.    July 28, 2015 Evidentiary Hearing

On July 28 2015, this Court held an evidentiary hearing. (Docket # 66). During

the hearing, defendants presented testimony from two attorneys employed by defendants'

counsel's law firm, Ingrid Morfa ("Morfa") and Sylvain Robitaille ("Robitaille"). (Tr. B 5-25,

26-31).[4] Defendants also called Thurmond to testify. (Tr. A 3-37).

Morfa testified that she is a partner at the Law Offices of Clint Curtis and Ingrid

Morfa and has assisted in the defense of this matter. (Tr. B 5). Morfa testified that she observed

Thurmond's Facebook and Instagram accounts and that the information that she viewed was

accessible to the public. (Tr. B 5-6). According to Morfa, neither she nor any one working with

her is "friends" with Thurmond on Facebook. (Tr. B 6).

Morfa testified that she first observed Thurmond's Facebook page sometime

between December 15 and 20, 2014. (Tr. B 11-12). At that time, according to Morfa, there were

---

[4] The transcripts of the hearing held on July 28, 2015 shall be referred to as "Tr. A __" and "Tr. B __." (Docket ## 75, 81).

"hundreds" of posts.  (Tr. B 7).  On May 15, 2015, Morfa looked again at Thurmond's Facebook page and observed that many posts were able to be viewed, but hundreds were missing.  (Tr. B 12-13).  Morfa testified that she also viewed the page on July 27, 2015.  (Tr. B 13-14).  At that time, only one post was displayed on the page.  (Tr. B 13).  According to Morfa, several posts that were visible in December 2014 were no longer visible.  (Tr. B 7-10; Defendants' Exhibits ("D. Ex.") 1-4).

Morfa also testified that she viewed Thurmond's Instagram account in December 2014 and on May 15, 2015; on May 15, 2015, the account was viewable by the public, and Morfa was able to view various photographs posted to Thurmond's page and saw some of the same photographs that she had seen in December 2014.  (Tr. B 14-20; D. Exs. 7-10).  According to Morfa, she also saw some of the same posts on July 27, 2015.  (Tr. B 16-20).  Morfa testified that she does not "follow" Thurmond on Instagram and was able to view the photographs posted to Thurmond's Instagram account because it was accessible by the public.  (Tr. B 20-21).

According to Morfa, some but not all of the posts on Thurmond's Instagram account were also posted on her Facebook account.  (Tr. B 21).  Morfa believed that Thurmond's Facebook account contained more information than her Instagram account.  (Tr. B 23).  For example, Morfa testified, one of Thurmond's Facebook friends had posted information suggesting that Thurmond "was living somewhere new."  (Tr. B 23).  Morfa did not testify as to the date of that posting or the date she viewed it.

Morfa testified that postings may be deleted from a Facebook account through a multi-step process.  (Tr. B 24-25).  According to Morfa, posts may also be hidden from an individual's Facebook page on a post-by-post basis or all at once by altering the security settings. (Tr. B 24-25).

Robitaille testified that he is a partner at the Law Offices of Clint Curtis and Ingrid Morfa and has also assisted in the defense of this action. (Tr. B 26-27). Robitaille testified that he viewed some of Thurmond's social media accounts, including her Facebook account, but that neither he nor any one working with him was "friends" with Thurmond on Facebook. (Tr. B 27). According to Robitaille, he first observed Thurmond's Facebook page in mid February 2015. (*Id.*). Robitaille indicated that the page was "pretty active" with hundreds of posts. (Tr. B 27-28). Robitaille testified that when he viewed the page again in mid June 2015, he was only able to observe a single post. (Tr. B 29). Robitaille testified that he also viewed Thurmond's Instagram account, which was accessible by the public, and it appeared identical at the time of the hearing as it had when he first viewed it. (Tr. B 29-30).

During the hearing, Thurmond affirmed her signature on her June 25, 2015 affirmation. (Tr. A 8-10; D. Ex. 6). Thurmond testified that, to the best of her knowledge, her Facebook page had always been set to private and she believed only her "friends" were able to view her page. (Tr. A 11-12). Thurmond also testified that she had altered the settings on her Instagram account "quite some time ago" to permit the public to view her Instagram profile. (Tr. A 12).

Thurmond admitted that she was notified by her attorney in mid May 2015 that the Court had entered a preservation order regarding her social media accounts; she testified that her understanding of the order was that it permitted her to add new posts but not to delete existing posts. (Tr. A 13). Thurmond testified that she knew that she should not delete anything, but did not recall whether she understood at the time of the order that she should not "modify" her Facebook page. (Tr. A 28). Thurmond testified that she "hid" two or three posts from her timeline in which she had been tagged by others. (Tr. A 13-14). Thurmond explained that she

cannot prevent other users from "tag[ging]" her in posts, but she can "untag" herself if she finds a particular post objectionable or does not want her friends to view it.  (Tr. A 31-32).

Thurmond testified that counsel did not tell her in December 2014 to refrain from altering her Facebook account.  (Tr. A 30).  She also testified that after learning in May 2015 that defendants were able to view her Facebook posts, she reviewed the privacy settings on Facebook to "make sure" that they continued to be set to private.  (Tr. A 14, 17).  According to Thurmond, when she viewed the settings, they were set to permit only "friends" to view her profile, and she believed that she was not altering her privacy settings.  (Tr. A 17-18).  She further testified that she did not believe she had deleted any posts between December 2014 and May 2015, although she could not recall for certain.  (Tr. A 14-15, 36-37).

Thurmond testified that she executed the May 19, 2015 affirmation that stated, "I have a Facebook and Instagram account, both accounts are private in that only people I have given permission can view the content in these accounts."  (Tr. A 20, 22-23; D. Ex. 5).  Thurmond conceded that despite the statement in the affirmation, her Instagram account was not private, as a result of a change she made in her privacy settings "quite some time ago."  (Tr. A 23-24).  Thurmond testified to her belief that her Facebook page continued to be private.  (Tr. A 24).  Thurmond testified that she believed her affirmation was truthful when she signed it even though she had altered her settings to make the Instagram account public "a long time ago." (Tr. A 25).

In response to questioning by defendants' counsel, Thurmond admitted that she had provided false information to police officers in the past.  (Tr. A 6).  She testified that she had told the police that someone else had stolen a television, when in fact she had stolen it.  (Tr. A 6).  Thurmond testified that she pleaded guilty to a larceny charge related to the theft.  (Tr. A 4).

At the conclusion of the hearing, both Thurmond and her attorney offered to provide a copy of her Facebook account to defendants and the Court.  (Tr. A 32).  According to Thurmond, review of her Facebook account would confirm that the posts that the defendants had identified as missing were still there.  (Tr. A 30).

### III.     Continuation of Evidentiary Hearing on November 18, 2015

The evidentiary hearing was continued on November 18, 2015, and Thurmond called Osbaldo Arce ("Arce") to testify and defendants called Bernadette Foley ("Foley"), Thurmond, and Morfa.  (Tr. C 5-37).[5]  Arce testified that he is employed by Legal Assistance of Western New York ("LAWNY") as a rural test coordinator for the Fair Housing Enforcement Project Unit.  (Tr. C 5).  On August 7, 2015, Arce met with Thurmond in his office, and Thurmond provided him with her password to access her Facebook account.  (Tr. C 5-6).  Arce testified that he viewed the account with Thurmond and began the process of printing the material contained in her account.  (Tr. C 7-8).  With assistance from Foley, over the course of approximately three days, they printed all of the postings between October 29, 2012 and June 14, 2013.  (Tr. C 7-9; Plaintiff's Exhibits ("P. Ex.") 1-2).  According to Arce, after they had printed a complete set of postings, he compared the printed set to the Facebook account to ensure that all of the posts had been printed.  (Tr. C 10).  Arce noted that several posts that defendants had identified as missing or deleted were included in the printed set of posts.  (Tr. C 11-12; P. Exs. 1-2).  Arce testified that neither he nor anyone else made any deletions or hid any posts during the process.  (Tr. C 13).

---

[5]  The transcript of the hearing held on November 18, 2015, shall be referred to as "Tr. C __."  (Docket # 82).

Foley testified that she had been employed by LAWNY for approximately six months. (Tr. C 17). Foley testified that she assisted Arce to print a set of postings from Thurmond's Facebook account. (Tr. C 18). Foley testified that Thurmond's password was kept in a secure place when not in use and that she did not delete, hide, or alter any of the posts on Thurmond's account. (*Id.*).

Thurmond testified that she provided Arce and Foley with access to her Facebook account and they printed a set of postings from the account. (Tr. C 20-21). She also testified that she did not accidentally delete any postings dated between January 2013 and March 2013 from her Facebook account, to the best of her knowledge. (Tr. C 22-23).

Morfa testified that she viewed Thurmond's Facebook account sometime between December 15 and 20, 2014 and observed a substantial quantity of posts. (Tr. C 25-26, 37). Morfa also reviewed a copy of the printed posts produced by Thurmond. (Tr. C 26-28; D. Exs. A-I). Morfa testified that the copy provided by Thurmond appeared to have the same number of posts for some months as existed when she observed Thurmond's Facebook page in December 2014. (Tr. C 28). Other months, however, including February and April through May 2013, appeared to have significantly fewer posts than when Morfa saw the account in December 2014. (Tr. C 28-29). According to Morfa, she recalled seeing posts in December 2014 that referenced "events and going out and parties" that were not included in the set of posts produced by Thurmond. (Tr. C 29).

Morfa testified that when she viewed Thurmond's Facebook account in December 2014, she saved some "screen shots" of the posts. (Tr. C 29). One of the screen shots captured a post made on March 27, 2013 and part of the post above it, which appeared to be a photograph of

a child's arm.  (Tr. C 30; D. Ex. J).  According to Morfa, that partial picture does not appear in the set of posts provided by Thurmond.  (Tr. C 29-30; D. Ex. D; P. Ex. 2).

Morfa also testified that another December 2014 screen shot captured a post dated February 20, 2013.  (Tr. C 32; D. Ex. K).  The post contained a photograph of a child dressed in pajamas sitting on the floor in front of a black and gold couch.  (Tr. C 32; D. Ex. K).  According to Morfa, this post is also missing from the printed set of posts produced by Thurmond.  (Tr. C 33; D. Ex. E; P. Ex. 2).

Finally, Morfa testified about a third missing post, which had appeared in her December 2014 screen shots.  (Tr. C 34; D. Ex. L).  The post, dated January 16, 2013, contains a photograph of a child's face.  (Tr. C 34-35; D. Ex. K).  Morfa testified that this post is also missing from the set of posts that Thurmond produced.  (Tr. C 34-36; D. Ex. F; P. Ex. 2).

## IV.   **Post-Hearing Submissions**

In their post-hearing submission, defendants contend that Thurmond had a duty to preserve her Facebook postings that arose when she commenced this action on October 24, 2014 or, at the very latest, on December 18, 2014, when her counsel received the December 18, 2014 email.  (Docket # 84 at 4).  Defendants maintain that Thurmond's Facebook posts are relevant because they reflect her emotional state after the alleged discrimination.  (*Id.* at 6, 8).  They also maintain that her Facebook posts refute her allegations of homelessness and separation from her children.  (*Id.* at 8).

Thurmond counters that defendants have failed to establish that any of her Facebook posts are relevant to this litigation, much less that she has deleted any relevant postings.  (Docket # 88 at ¶¶ 3-6).  According to Thurmond, defendants have identified only

three posts that were deleted from Thurmond's Facebook account.  (*Id.*).  Thurmond maintains that the missing posts were deleted inadvertently and were similar to other posts remaining on the account, which defendants have and may use in their defense.  (*Id.*).

Finally, Thurmond concedes that her May 19, 2015 affirmation inaccurately states that her Instagram account was private.  (*Id.* at ¶ 18).  According to counsel, the error occurred as a result of counsel's careless drafting and was not intended to mislead the Court.  (*Id.* at ¶¶ 19-25).  Thurmond disputes any contention that the inaccurate statement could be viewed as material because Thurmond's Instagram account is not the subject of any spoliation allegation. (*Id.*).

## DISCUSSION

I.    **Spoliation of Facebook Postings**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'" *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1724 (2013); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998)), *superseded by rule on other*

*grounds as recognized by CAT3, LLC v. Black Lineage, Inc.*, 2016 WL 154116 (S.D.N.Y. 2016);

*Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("[w]hether exercising its

inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a

party for discovery abuses"), *cert. denied*, 528 U.S. 1119 (2000).

 A party bringing a spoliation motion must demonstrate that: (1) the party charged

with destroying the evidence had an obligation to preserve it; (2) the records were destroyed with

a "culpable state of mind"; and, (3) the destroyed evidence was relevant to the party's claim or

defense. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d at 107 (citing *Byrnie v.*

*Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-08 (2d Cir. 2001)); *see also Arista Records*

*LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009); *Zubulake v. UBS Warburg*

*LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

 A. <u>Duty to Preserve</u>

 "Identifying the boundaries of the duty to preserve involves two related inquiries:

*when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake v. UBS*

*Warburg LLC*, 220 F.R.D. at 216 (emphasis in original). A party is obligated to preserve

evidence when it has "notice that the evidence is relevant to litigation or when a party should

have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express*

*Corp.*, 247 F.3d 423, 436 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001); *Creative Res. Grp. of N.J.,*

*Inc. v. Creative Res. Grp., Inc.*, 212 F.R.D. 94, 105 (E.D.N.Y. 2002).

 The motions before the Court indeed raise interesting and complex issues about

the duty to preserve information in social media accounts, particularly in cases of alleged

discrimination involving claims for emotional distress damages. Here, however, I need not

attempt to resolve them because, even assuming *arguendo* that Thurmond had a duty to preserve

her social media accounts when she commenced the action, I conclude that the three posts that defendants have proved were deleted from her Facebook page were deleted inadvertently and were not relevant to this litigation.

### B.    Culpability

"[A] finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator." *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d at 268.  Rather, a finding of gross negligence will satisfy the "culpable state of mind" requirement, as will knowing or negligent destruction of evidence. *Id.*; *Residential Funding Corp.*, 306 F.3d at 108 ("[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence"), *superseded by rule as recognized by CAT3, LLC v. Black Lineage, Inc.*, 2016 WL 154116 at *4;[6] *Zubulake*, 220 F.R.D. at 220 ("a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence").  "[F]ailure to implement a litigation hold at the outset of litigation amounts to gross negligence."[7] *Toussie v. County of Suffolk*, 2007 WL 4565160, *8 (E.D.N.Y. 2007); *see also Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579, *7 (S.D.N.Y. 2005) ("the utter failure to establish any form of litigation hold at the outset of litigation is grossly

---

[6]  Effective December 1, 2015, the rule governing spoliation sanctions for destruction of electronically stored information was amended.  *See* Fed. R. Civ. P. 37(e).  At least one court has interpreted the amendment to be "more lenient [with respect] to the sanctions that can be imposed for violation of the preservation obligation" and has applied the amended rule retroactively.  *CAT3, LLC v. Black Lineage, Inc.*, 2016 WL 154116 at *5.  The court reasoned that the amendment to Rule 37 was designed to overrule the holding in *Residential Funding Corp.*, 306 F.3d at 108, which permits the imposition of severe sanctions such as dismissal or an adverse inference in the absence of a showing of bad faith or willfulness.  *See id.* at *4 (citing Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).  Although defendants did note the recent amendment in their submission (Docket # 84 at 8), neither party has advocated for the retroactive application of the current version of Rule 37, and I have applied the pre-December 2015 framework.  In any event, given the amended rule's requirement of a finding of prejudice or an intent to deprive another party of information, I conclude that application of the amended rule would not result in a different outcome in this case.

[7]  The record before the Court does not demonstrate that Thurmond failed to implement any form of a litigation hold at the inception of the case; that issue was not addressed beyond the issue of the preservation of social media postings.

negligent"); *Zubulake*, 220 F.R.D. at 220-21 ("[o]nce the duty to preserve attaches, any

destruction of evidence is, at a minimum, negligent"; failure to preserve backup tapes following

initiation of lawsuit was grossly negligent); *Barsoum v. NYC Hous. Auth.*, 202 F.R.D. 396, 400

(S.D.N.Y. 2001) (loss of tape recording of conversation was grossly negligent).  In contrast,

where the document destruction is accidental or without fault, courts have found mere

negligence.  *See*, *e.g.*, *Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of

N.Y. & N.J.*, 601 F. Supp. 2d 566, 570 (S.D.N.Y. 2009) (destruction of documents following

September 11, 2001 terrorist attacks was negligent); *Davis v. Speechworks Int'l, Inc.*, 2005 WL

1206894, *4 (W.D.N.Y. 2005) (no culpability where documents were lost during a move).

       Despite defendants' contentions that Thurmond engaged in widespread deletion

of posts from her Facebook account, the evidence adduced during the evidentiary hearing

demonstrates that the majority of Thurmond's posts remain accessible on her account, have not

been deleted, but were simply hidden from defendants' view due to an apparent modification of

Thurmond's security settings.  The reasonable conclusion from the evidence adduced at the

hearing is that Thurmond's Facebook account was publically accessible until approximately May

15, 2015 when Thurmond adjusted the privacy settings to make the account accessible only to

her Facebook "friends," an adjustment that removed postings from public view but did not delete

them.  Thurmond has now produced hundreds of postings from her Facebook account that were

posted between October 2012 and June 2013.  That period of production spans a few months

prior to the alleged discrimination through six months after the incident.  Although Morfa

testified generally that she believes that Thurmond's printed posts for a few of the months during

that period contain substantially fewer posts than she saw in December 2014, she was able to

identify only three particular posts described *supra*.  The rest of her testimony is simply too vague as to timing and content to support a finding that other posts were deleted. [8]

Indeed, although defendants' sanctions motions charged Thurmond with deleting a substantial quantity of relevant posts, those submissions in fact identified only five specific posts between the period of October 2012 and June 2013 that were allegedly deleted.  (Docket ## 37, 40).  Significantly, each of those five posts – two dated December 28, 2012 (one of which referred to a child's design and the other which referred to Thurmond's inactivity), one dated December 30, 2012 (complaining about snow plowing), a post dated March 20, 2013, and a profile picture posted on March 24, 2013 (Docket ## 37-1 at ¶ 8; 40 at ¶ 14 and Ex. A) – was including among the hundreds of printed posts produced to defendants during the hearing.  (P. Exs. 1, 2).

In sum, no credible evidence in the record demonstrates that Thurmond intentionally or with bad faith deleted posts from her Facebook account.  As discussed below, the three identified posts that were deleted contain photographs of children that are similar to many posts preserved on Thurmond's page that have been produced to defendants.  (*Compare* D. Exs. J-L *with* P. Ex. 1-2).  Thurmond has offered no explanation for how or why these three posts were deleted, although her attorney posited that the deletions inadvertently occurred during the process of printing and producing the posts to defendants.  (Docket # 88 at ¶ 6).  I can fathom no reason why Thurmond would intentionally delete those three posts while retaining and producing other similar posts.  Thus, the record supports a finding that the posts were, at worst, negligently deleted.

---

[8]  In addition, Morfa testified that she recalled seeing posts relating to social functions, but it was unclear when those posts had been posted and whether they would have been included within the period of posts produced by Thurmond.  (Tr. C 29).

C.   <u>**Relevance**</u>

Finally, the moving party must show that the destroyed evidence was relevant to its claims or defenses.  *Residential Funding, Corp.*, 306 F.3d at 108.  As the Second Circuit has explained in the context of an application for an adverse inference instruction,

> [R]elevant in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction."

*Id.* at 108-09 (quoting *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998), *overruled on other grounds, Rotella v. Woods*, 528 U.S. 549 (2000)).  A court may assume that the destroyed evidence was relevant if it was destroyed in bad faith or through gross negligence.  *Id.* at 109. "By contrast, when the destruction of evidence is negligent, relevance must be proven through extrinsic evidence."  *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d at 439 (citing *De Espana v. Am. Bureau of Shipping*, 2007 WL 1686327, *6 (S.D.N.Y. 2007)).  "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him."  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 77 (S.D.N.Y. 1991)).  Although a finding that the moving party has been prejudiced is not a prerequisite to the imposition of sanctions, *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 229 (S.D.N.Y. 2003), *adhered to on reconsideration by*, 2004 WL 1943099 (S.D.N.Y. 2004), before awarding "more severe sanctions – such as dismissal, preclusion, or the imposition of an adverse inference – the court must consider . . . whether the innocent party has suffered prejudice as a result of the loss of [relevant] evidence."

*Williams v. New York City Transit Auth.*, 2011 WL 5024280, *8 (E.D.N.Y. 2011) (quoting

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d at

467).

At the conclusion of the evidentiary hearing in this matter, the Court expressed its

view that defendants had failed to establish widespread deletion of Facebook posts and that the

three posts that were deleted did not seem relevant.  Despite the Court's articulated doubts as to

relevance, defendants' post-hearing submission makes no attempt to demonstrate the relevance

of the three posts.[9]  Rather, defendants broadly assert that Thurmond's entire Facebook account

is relevant to refute her claim for emotional distress damages and that some of her posts might be

relevant to her claims of "homeless[ness]" and separation from one or both of her children.

(Docket # 84 at 6, 8).

As an initial matter, I disagree that the entirety of a plaintiff's social media

account is *per se* relevant to any claim for emotional distress damages.  Of course, within the

specific factual context of a given case, social media postings may be relevant to particular

claims or defenses, including where social media posts may contradict claims of physical or

emotional injury.  *See*, *e.g.*, *Lewis v. Bellows Falls Congregation of Jehovah's Witnesses,*

*Bellows Falls, Vt., Inc.*, 2016 WL 589867, *1-2 (D. Vt. 2016) (certain categories of Facebook

posts relevant to plaintiff's claims of "severe, life-changing, permanent, emotional damages");

*Reid v. Ingerman Smith LLP*, 2012 WL 6720752, *1 (E.D.N.Y. 2012) (public portions of

plaintiff's account provide "probative evidence of [plaintiff's] mental and emotional state, as

well as reveal the extent of activities in which she engages"; "plaintiff's private postings may

---

[9] In response to the Court's expressed views, defendants' counsel suggested during the proceedings that the furniture depicted in the background of two of the deleted photographs was relevant to demonstrate the location of Thurmond's children.  Defendants failed to articulate this argument in their post-hearing submission.  In any event, in the absence of any other evidence, I reject the notion that the deleted photographs are relevant because they depict a patterned couch that might help determine where Thurmond's children were at a particular point in time.

likewise contain relevant information that may similarly be reflective of her emotional state"); *Mailhoit v. Home Depot U.S.A., Inc.*, 285 F.R.D. 566, 571 (C.D. Cal. 2012) ("[p]laintiff has placed her emotional state at issue in this action and it is conceivable that some [social media] communications may support or undermine her claims of emotional distress"); *Holter v. Wells Fargo & Co.*, 281 F.R.D. 340, 344 (D. Minn. 2011) ("given that plaintiff has placed her employment with and termination of employment from defendant, along with her mental disability and emotional state at issue, the defendant is entitled to information from her social media websites that bear on these topics"); *E.E.O.C. v. Simply Storage Mgmt., LLC*, 270 F.R.D. 430, 435 (S.D. Ind. 2010) ("[i]t is reasonable to expect severe emotional or mental injury to manifest itself in some [social media] content, and an examination of that content might reveal whether onset occurred, when, and the degree of distress").

That said, "[a] plaintiff's entire social networking account is not necessarily relevant simply because he or she is seeking emotional distress damages." *Giacchetto v. Patchogue-Medford Union Free Sch. Dist.*, 293 F.R.D. 112, 115 (S.D.N.Y. 2013). As some courts have cautioned, "the relationship of routine expressions of mood [in a social media posting] to a claim for emotional distress damages is much more tenuous [than the relationship between a post "reflecting engagement in a physical activity" to a claim for physical injury damages]." *Id.* at 116 (citing Brown, Kathryn R., *The Risks of Taking Facebook at Face Value: Why the Psychology of Social Networking Should Influence the Evidentiary Relevance of Facebook Photographs*, 14 Vand. J. Ent. & Tech. L. 357, 365 (2012) ("[b]ecause social networking websites enable users to craft a desired image to display to others, social scientists have posited that outside observers can misinterpret that impression")). Moreover, "routine status updates and/or communications on social networking websites are not, as a general matter,

relevant to [a] claim for emotional distress damages, nor are such communications likely to lead to the discovery of admissible evidence regarding the same."[10] *Id.* For these reasons, many courts have declined to order wholesale production of a litigant's social media accounts. *See Lewis v. Bellows Falls Congregation of Jehovah's Witnesses, Bellows Falls, Vt., Inc.*, 2016 WL 589867, at *2 (defendants were not entitled to "unfettered access to [plaintiff's] Facebook account . . . 'simply because [p]laintiff has a claim for emotional distress damages'") (quoting *Giacchetto v. Patchogue-Medford Union Free Sch. Dist.*, 293 F.R.D. at 116); *Caputi v. Topper Realty Corp.*, 2015 WL 893663, *8 (E.D.N.Y. 2015) (declining to "give [d]efendants complete access to [p]laintiff's Facebook account for the purpose of identifying photographs, postings or private messages that may appear inconsistent with someone experiencing emotional distress"); *Johnson v. PPI Tech. Servs., L.P.*, 2013 WL 4508128, *2 (E.D. La. 2013) ("[s]imply placing their mental and physical conditions at issue is not sufficient to allow [defendant] to rummage through [plaintiffs'] social media sites[;] [a]lmost every plaintiff places his or her mental or physical condition at issue, and this Court is reticent to create a bright-line rule that such conditions allow defendants unfettered access to a plaintiff's social networking sites"); *Reid v. Ingerman Smith LLP*, 2012 WL 6720752 at *2 ("this Court declines to require full disclosure of all materials contained in plaintiff's social media accounts because not all postings will be relevant to her claims"); *Mailhoit v. Home Depot U.S.A., Inc.*, 285 F.R.D. at 571 ("[t]o be sure, anything that a person says or does might in some theoretical sense be reflective of her emotional state[;] [b]ut that is hardly justification for requiring the production of every thought she may have reduced to writing, or, indeed, the deposition of everyone she may have talked to") (quoting

---

[10] Amendments to the Federal Rules of Civil Procedure effective December 1, 2015 have altered the scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

*Rozell v. Ross-Holst*, 2006 WL 163143, *3-4 (S.D.N.Y. 2006)); *Holter v. Wells Fargo & Co.*, 281 F.R.D. at 344 ("[w]hile everything that is posted on a social media website is arguably reflective of a person's emotional state[,] [t]his [c]ourt would not allow depositions of every friend and acquaintance to inquire about every conversation and interaction with plaintiff[;] [s]o too, the [c]ourt will not require plaintiff to produce all information from all her social media websites to obtain similar information").

Defendants' contention that the deletion of any of Thurmond's Facebook posts warrants sanctions – on the grounds that every post is potentially relevant to her emotional damages claim – sweeps far too broadly. With respect to the three deleted posts, defendants have failed to articulate any basis upon which to conclude that they are relevant to the issue of emotional distress. I likewise can think of none.

I also reject any suggestion that they are conceivably relevant to Thurmond's allegations of "homelessness" or separation from her children. Her complaint alleges that both before and after the claimed discrimination by defendants, Thurmond and her oldest daughter alternated between staying at residences belonging to her sister and one of her friends, and her youngest daughter was living with Thurmond's grandfather and father. (Docket # 1 at ¶¶ 11-12, 27). Defendants appear to believe that any photograph of Thurmond's daughters inside a premises is relevant because it may undercut Thurmond's claim that she was "homeless" or separated from her daughter. Thurmond does not claim that she was living on the street or in a shelter or never saw her children during the relevant period. Rather, she alleges that she alternated between two residences belonging to family and friends. It is reasonable to expect that Thurmond would have photographs of her children inside those premises, and likely inside other locations as well. In the absence of any evidence that the deleted photographs depicted her

children living in a premises actually leased by Thurmond – and there is none – I am not prepared to find that she had a duty to preserve every photograph of her children taken inside a location so that defendants may scrutinize them in an effort to identify the precise location.

Accordingly, with respect to the three Facebook posts that are missing from the printed posts produced to defendants (D. Exs. J-L), I find that they are not relevant to this action; in any event, defendants possess two of the postings and part of the third, as well as many other photographs depicting Thurmond's children. Thus, the deletion of the three posts from Thurmond's account cannot be said to have harmed defendants in their defense of this action and sanctions for spoliation are not warranted. *See Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 744 (S.D.N.Y. 2011) (spoliation sanctions not warranted where plaintiffs were able to obtain a copy of deleted email and where "there is nothing to suggest that the deleted email or its attachments would have constituted evidence favorable to plaintiff"); *Steuben Foods, Inc. v. Country Gourmet Foods, LLC*, 2011 WL 1549450, * 3 (W.D.N.Y. 2011) ("[c]ourts have found that actual destruction or loss of *relevant* documents is a prerequisite for sanctions based on spoliation") (emphasis added); *Schwarz v. FedEx Kinko's Office*, 2009 WL 3459217, *10 (S.D.N.Y. 2009) (denying spoliation sanctions where plaintiff "failed to show that the [lost piece of evidence] is relevant to her claims, as they have been consistently advanced in this litigation") (collecting cases); *Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 179 (E.D.N.Y. 2009) (sanctions not warranted where "[p]laintiff has produced nothing, aside from speculation, as support for her claim that the destroyed emails would have" been favorable to her claim).

I note that defendants moved for spoliation sanctions before even serving document discovery requests seeking production of information from Thurmond's social media accounts.  The evidence adduced during the hearing demonstrated that defendants' motion was premised primarily upon their unfounded belief that Thurmond was engaging in wholesale deletion of her Facebook postings.  In reality, the majority of Thurmond's posts were merely hidden from defendants' view – a fact that defendants could have learned had they requested the information through discovery.

Finally, I recommend that defendants' motion for preliminary injunctive relief be denied.  Defendants now have a printed copy of Thurmond's Facebook posts during the months prior and subsequent to the alleged discrimination and certainly have had an adequate period of time within which to print or record her Instagram posts.  Of course, should the district court agree that no need exists for injunctive relief, that decision would not relieve Thurmond of any independent duty she has to preserve relevant evidence.

## II.   **Disqualification of Counsel**

On August 25, 2015, defendants filed a motion to disqualify Thurmond's attorney, Laurie Lambrix ("Lambrix"), Esq., and LAWNY, from representing Thurmond based upon a conflict of interest.  (Docket # 69).  The motion is based upon the following legal and factual predicates: (1) Thurmond's duty to preserve Facebook evidence arose at the latest by December 18, 2014, when counsel for defendants sent an email to Lambrix advising her to counsel her client against spoliation; (2) as Thurmond testified, Lambrix did not advise Thurmond of her preservation duties until sometime in May 2015; and, (3) Thurmond deleted posts prior to May 15, 2015.  (Docket # 69-1 at ¶¶ 4-7, 10).  On this record, defendants argue that

25

Lambrix's failure to advise Thurmond of her preservation duties prior to May 2015 caused the spoliation of relevant social media evidence and subjects Thurmond to sanctions. (*Id.* at ¶¶ 11-12). Defendants maintain that Lambrix and LAWNY are potentially liable for any potential sanctions, creating a conflict of interest between Lambrix, LAWNY, and Thurmond. (*Id.* at ¶¶ 13-16).

   Thurmond opposes the motion, maintaining that the motion should be denied because there has been no finding that Thurmond spoliated any relevant evidence. (Docket # 73 at ¶¶ 3-4). In any event, Thurmond maintains that defendants have failed to meet the "heavy burden" required to warrant disqualification of counsel. (*Id.* at ¶ 8; Docket # 74).

   On February 19, 2015, defendants filed a second declaration in further support of their motion to disqualify counsel. (Docket # 85). The declaration raises factual allegations not previously addressed and relies upon evidence that is not apparently admissible. (Docket # 85 at Ex. A). Defendants argue that LAWNY violated its internal procedures by failing to record the discrimination testing referred to in the complaint. (Docket # 85 at ¶¶ 5-9). Additionally, defendants maintain that LAWNY failed to investigate adequately the criminal background of the tester in this case. (*Id.* at ¶¶ 13-17). Defendants maintain that they were damaged as a result of LAWNY's failures and indicate that they intend to sue LAWNY. (*Id.* at ¶¶ 17-21). According to defendants, the possibility of that lawsuit creates an additional conflict of interest that mandates LAWNY's disqualification. (*Id.*). With respect to these new allegations, Lambrix maintains that defendants are relying on inadmissible evidence, apparently police reports, and that the tester in this case was properly screened prior to employment by LAWNY. (Docket # 88 at ¶¶ 7-11 and Ex. A).

Disqualification is not warranted in this case.  Insofar as the potential for spoliation sanctions gives rise to a potential conflict, *see Baker v. Dorfman*, 2000 WL 1010285, *10 (S.D.N.Y.) ("counsel appeared to argue that any motion for sanctions directed against both client and attorney itself creates a conflict of interest[;] [i]f this were true, then the sanctions regime, intended in large part to deter vexatious and dilatory litigation tactics, would itself be another weapon in the arsenal of an attorney or litigant seeking to delay: any motion for sanctions would provide grounds for counsel to withdraw, thus causing further delay"), *aff'd in part and vacated in part on other grounds*, 232 F.3d 121 (2d Cir. 2000); *cf.* Fed. R. Civ. P. 11(b) and (c) advisory committee's note to 1993 amendment ("the court may defer its ruling (or its decision as to the identity of the persons to be sanctioned) until final resolution of the case in order to avoid immediate conflicts of interest and to reduce the disruption created if a disclosure of attorney-client communications is needed to determine whether a violation occurred or to identify the person responsible for the violation"), I have already concluded that spoliation sanctions are not warranted.  Thus, any potential for conflict has been eliminated.

With respect to defendants' contentions regarding LAWNY's compliance or non-compliance with internal procedures in conducting the testing in this case or the background investigation of the tester, defendants have cited no authority for their proposition that LAWNY owed defendants a legal duty to comply with its internal procedures or that, if one existed, defendants have a viable cause of action against LAWNY on the facts of this case.  Defendants' motion for disqualification on the basis of this speculative potential conflict is denied.

## III.   **Thurmond's Other Conduct**

Although I find that Thurmond has not spoliated relevant evidence, her conduct nonetheless raises two issues of concern to the Court.  First, the record demonstrates that Thurmond violated this Court's May 21, 2015 verbal preservation order by hiding posts from her Facebook page.  Second, the record makes clear that Thurmond's May 19, 2015 affidavit (Docket # 31) submitted in connection with her opposition to defendants' motion to amend contained a false statement.

A court has the inherent authority to sanction a party or its attorney in order to effectively "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases."[11] *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991).  The power may also be exercised in response to a party or attorney who has willfully disobeyed a court order or has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Servs. Co. v. Wilderness Society,* 421 U.S. 240, 258-59 (1975); *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 71, 78 (2d Cir.2000).

With respect to the Facebook posts, defendants contend that on the evening of May 21, 2015, several posts remained visible on Thurmond's Facebook account, but that none of the posts, except one dated July 13, 2014, were visible when their counsel subsequently checked the account.[12]  (Docket # 40-1 at ¶¶ 6, 11 and Exs. A and D).  In response, Thurmond has not denied that some of her posts remained visible on May 21, 2015.  Rather, she admitted that she "may have" adjusted the privacy settings on her account to prohibit unauthorized individuals from viewing her Facebook account.  (Docket # 52 at ¶ 6).  When questioned about that

---

[11]  The nature of the issues of concern to the Court also implicate the authority to impose sanctions pursuant to Rules 11 and 37.

[12]  Thurmond also admitted that she "hid" two or three posts from her timeline that had been posted by other people and in which she had been tagged, although it is not clear whether this occurred before or after this Court's May 21, 2015 verbal order.  (Docket # 52 at ¶ 4).

statement at the hearing, she testified that she believed that her account was private and was only attempting to confirm her belief by viewing her privacy settings.  (Tr. A 14, 17).  Thurmond posited that her act of reviewing her settings may have resulted in the modification of the settings from public to private.  (Tr. A 18).  With respect to the false statement contained in her affidavit about the Instagram account, Thurmond's attorney argues that it resulted from counsel's inadvertent drafting error and failure to review the affidavit with her client before dispatching a paralegal to obtain Thurmond's signature.  (Docket # 88 at ¶¶ 18-25).

By altering her Facebook account, Thurmond violated the Court's May 21 order. Her conduct had the effect of hiding her postings from public view, and hence from defendants' counsel's view.  Of course, it does not appear that the postings were deleted, and they remain available for defendants' use, and defendants have not shown that they were prejudiced by Thurmond's conduct in violating the order.  Nevertheless, it is troubling that the posts were removed from public view after this Court issued a consent order designed to preserve the *status quo* of her social media accounts.  Also troubling is Thurmond's execution of an affidavit that contained a statement she knew to be inaccurate.  Although the false statement was ultimately immaterial to the issues in the pending motions, Thurmond's willingness to sign the affidavit knowing or having reason to know that it included a false statement threatens the integrity of the judicial process.  Thurmond's conduct in both respects is certainly a fair subject for cross-examination at trial and could result in the impeachment of her credibility.

Although I decline to impose sanctions,  *see 1800 W. Lake Street, LLC v. Am. Chartered Bank*, 2016 WL 232423, *2 (N.D. Ill. 2016) (declining to impose sanctions for submission of false statement in affidavit submitted to Court), my decision should not be interpreted to discount the importance of strict compliance with all Court orders and the exercise

of careful attention to all sworn statements made to the Court to ensure their accuracy and truthfulness.  Plaintiff is admonished that any instances of future similar conduct are likely to result in sanctions.  *See id.* ("public determination" of "inappropriate" conduct "amounts to a sufficient penalty from the standpoint of deterrence").

## CONCLUSION

For the foregoing reasons, defendants' motions for sanctions (**Docket ## 37, 40**) and for the disqualification of plaintiff's counsel (**Docket # 69**) are **DENIED**.  I recommend that the district court deny defendants' request for preliminary injunctive relief (**Docket # 37**).

**IT IS SO ORDERED.**


                                                        *s/Marian W. Payson*
                                           _____
                                                        MARIAN W. PAYSON
                                                     United States Magistrate Judge


Dated: Rochester, New York
       March 31, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(d) and Local Rule 72(b).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b), or with the similar provisions of Rule 72(a) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
————————————————
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March 31, 2016